## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| **Plaintiff,** | |
| v. | Case No. 25-CR-194-JFH |
| MARK WILLIAMS, | |
| **Defendant.** | |

## OPINION AND ORDER

Before the Court is an Objection to Magistrate's Report and Recommendation ("Objection") filed by Defendant Mark Williams ("Defendant"). Dkt. No. 30. Defendant objects to United States Magistrate Judge Jodi F. Jayne's Report and Recommendation [Dkt. No. 29] advising the Court to deny Defendant's Motion to Suppress [Dkt. No. 20]. The United States of America ("Government") has since responded to the Objection [Dkt. No. 31], and the matter is now ripe for consideration. For the reasons stated below, Defendant's Objection is OVERRULED.

## BACKGROUND

On April 1, 2025, the Tulsa Police Department received an anonymous 911 call reporting several gunshots fired in the vicinity of 600 E. Virgin Street, Tulsa, Oklahoma. Dkt. No. 20-1 (Affidavit for Search Warrant) at 2. The caller reported hearing a total of seven gunshots and was further informed by a neighbor that the shots had originated from "the rock house on the corner," with two of the shots having passed by the neighbor's head. *Id.* TPD Officer K. Vanhoozer was dispatched to the scene, whereupon he identified the house in question to be located at the address of 2021 North Frankfort Place, Tulsa, Oklahoma ("Frankfort Residence"). *Id.* After identifying the property, Officer Vanhoozer observed "a tall skinny black male" enter the building "holding what he believed to be a black semi-automatic handgun." *Id.*

Officer Vanhoozer approached the Frankfort Residence and met with a white man named Neil McGuire.  *Id.*  Mr. McGuire said he only knew the man seen entering the building to be his roommate's brother yet indicated that the brother was also a resident of the Frankfort Residence.  *Id.*  When asked about the shooting reported from his building, Mr. McGuire first denied having any knowledge of the gunfire.  *Id.*  Upon further inquiring, Mr. McGuire admitted to having heard the gunshots but suggested that the incident was "harmless" because the shooting had not been directed at any persons, pets, or property.  *Id.*  Sometime after speaking with Mr. McGuire, Officer Vanhoozer witnessed a young black man similar in appearance to the earlier individual exit the Frankfort Residence.  *Id*.  When approached, the man identified himself as Dametris Ford and told Officer Vanhoozer that he lived in the building.  *Id.*  When asked about the shooting, Mr. Ford claimed to have been setting off fireworks earlier that day.  *Id*.

The foregoing is detailed in the Affidavit for Search Warrant ("Affidavit") authored by fellow TPD Officer Rage Staggs.  *See generally id.*  Officer Staggs was later assigned to the investigation on April 11, 2025, and completed the Affidavit two weeks after Officer Vanhoozer's dispatch to the Frankfort Residence, on April 15, 2025.  *Id.* at 2-3.  The Affidavit cites the offense under investigation as "Discharging a Firearm (§21-1364)."  *Id.* at 1 (referring to 21 O.S. § 1364).  It lists a total of eight categories of evidence to be seized:

- Firearms
- Ammunition
- Magazines, holsters, and other items associated with firearms
- Spent cartridge casings
- Gun boxes, gun cases, safes, lock boxes
- Proof of ownership of such items
- Proof of residency
- Cell Phones and contents within

*Id.*  In preparation of the Affidavit, Officer Staggs states that he reviewed Officer Vanhoozer's body camera footage as well as a report compiled after the incident.  *Id.* at 2.  Based on his review,

Officer Staggs concludes that it is "highly likely that the firearm and/or other evidence related to this incident may still be located inside 2021 N Frankfort Place." *Id*. In support of his probable cause determination, Officer Staggs additionally states the following:

> Your affiant believes that evidence associated with this crime is kept at this address. Your affiant knows through his training and experience that those who possess firearms often store them at their place of residence for safe keeping. Your affiant knows that firearms are a constant target of thieves, are in great demand, and can easily be sold on the street. Therefore, due to a firearm's high street value and difficulty to obtain after a felony conviction, convicted felons usually retain these firearms and rarely dispose of them even after a high-profile incident.

> Your affiant also knows through his training and experience that cellular devices are commonly used to facilitate violent crimes, and that criminals often communicate on those devices prior to the occurrence of violent crimes. Your affiant knows that those phones can often hold evidence of prior crimes that were committed by the individual as well as associates, possibly family members and wives/girlfriends. Your affiant knows from his experience that those individuals will often have pictures and/or videos of crimes they have committed. Your affiant also knows from his experience that individuals involved in criminal activity will also have text messages and/or social media posts in their cellular phones related to prior crimes they have committed or plan to commit in the future.

> Your Affiant knows that firearms are difficult to purchase for those who are not legally allowed to obtain them from a legitimate store. Your Affiant knows that firearms are valuable and are usually held by criminals for long periods of time. Your Affiant knows that social media and internet websites are how criminals usually buy and sell firearms. Your Affiant believes that cell phones belonging to the residents of the house to be searched will contain information about where the firearms were purchased. Your affiant requests the issuance of a search warrant for the residence to be searched, 2021 N Frankfort Place, including the rooms, attics, basements, and other parts therein, the surrounding grounds, any garages, storage rooms, trash containers, safes, lock boxes and outbuildings of any kind located thereon, and any vehicles directly on the property or in the street in front of or nearby or adjacent to the above identified location, provided that prior to searching said vehicle or vehicles, the vehicle(s) can be specifically connected to the suspect, visitors as well as other occupants at the residence to be searched or to the residence to be searched. The search additionally to include any person(s) therein that could upon their person conceal firearms.

> The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other officers, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested Search Warrant and does not set forth all my knowledge about this matter.

*Id.* at 2-3.

The corresponding Search Warrant for Premises ("Warrant") was likewise completed by Officer Staggs on April 15, 2025. Dkt. No. 20-2 at 1. It lists the same eight categories of evidence noted in the Affidavit and describes the Frankfort Residence as the property to be searched. *Id.* The Warrant does not, however, reiterate discharge of a firearm or otherwise list any offense under investigation. *Id.* Even so, the Warrant was authorized by return electronic communication and issued by the magistrate that same day. *Id.* at 2. While the Affidavit is not explicitly referenced in the Warrant, the magistrate's return does state the following, in relevant part: "The undersigned magistrate received the notarized affidavit of the affiant." *Id.*

Accompanied by fellow TPD officers, Officer Staggs executed the Warrant the next day, April 16, 2025. Dkt. No. 21-1 at 6 (Officer's Return). In total, police recovered one black 9mm handgun, three loaded magazines, one gun holster, and several spent shell casings. *Id.* at 7 (TPD Property Receipt). Officers discovered the shell casings in the backyard of the Frankfort Residence and two of the loaded magazines stashed in different locations within the residence. *Id.* The third magazine was inserted in the 9mm handgun and found together with the holster under a bed in the building's second floor loft bedroom. *Id.* Defendant then occupied that bedroom with his girlfriend and was arrested on-scene by executing officers. Dkt. No. 29 at 5. He is indicted with one count of Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Dkt. No. 2.

Defendant moves to suppress all evidence derived from the Warrant on Fourth Amendment grounds. Dkt. No. 20 ("Motion"). After holding an evidentiary hearing on the matter, the Magistrate Judge issued a Report and Recommendation ("R&R") recommending that the Court deny the Motion. Dkt. No. 29. Defendant lodged his Objection in timely fashion, on September 25, 2025 [Dkt. No. 30], to which the Government has responded in opposition [Dkt. No. 31].

## GENERAL STANDARD

The Fourth Amendment protects against unreasonable searches and seizures by providing that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. For a search or seizure to be reasonable, it must generally be predicated upon a warrant that satisfies three foundational requirements. "First, warrants must be issued by neutral, disinterested magistrates." *Dalia v. United States*, 441 U.S. 238, 255 (1979) (collecting cases); *accord United States v. Ramirez*, 63 F.3d 937, 941 (10th Cir. 1995). Second, "a search warrant must issue only upon probable cause," which in turn "requires more than mere suspicion but less evidence than is necessary to convict." *United States v. Burns*, 624 F.2d 95, 99 (10th Cir. 1980). "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Third, and finally, "a search warrant must 'describe the items to be seized with as much specificity as the government's knowledge and circumstances allow.'" *United States v. Suggs*, 998 F.3d 1125, 1132 (10th Cir. 2021) (quoting *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988)). This final element, known simply as the particularity requirement, seeks to ensure that any search conducted by law enforcement "will be carefully tailed to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *see generally Stanford v. Texas*, 379 U.S. 476, 481 (1965) ("Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists.").

A warrant is invalid if it fails to meet any one of the Fourth Amendment's three foundational requirements, and evidence obtained pursuant to a deficient warrant is generally subject to suppression absent application of a recognized exception to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967) (noting that "searches conducted outside the judicial process . . . are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." (footnotes omitted) (collecting cases); *United States v. Sells*, 463 F.3d 1148, 1154 (10th Cir. 2006). The exclusionary rule accordingly acts to bar a government from introducing evidence obtained pursuant to a deficient warrant. *E.g. Mapp v. Ohio*, 367 U.S. 643, 654-53 (1961) (reiterating that "all evidence obtained by an unconstitutional search and seizure was inadmissible in a federal court regardless of its source" and extending the same principle to state courts). "[S]uppression is not," however, "an automatic consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 137 (2009). Rather, the exclusionary rule is a "massive remedy" to be used only in "last resort." *Hudson v. Michigan*, 547 U.S. 586, 591, 599 (2006) (holding, for example, that law enforcement's failure to abide by the common law 'knock-and-announce' rule recognized in *Wilson v. Arkansas*, 514 U.S. 927 (1995) was not alone sufficient to merit application of the exclusionary rule). In other words, the mere fact that a Fourth Amendment violation has occurred, "i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring*, 555 U.S. at 140 (citing *Gates*, 462 U.S. at 223). Commensurate with the vastness of its remedy, "the rule's application has been restricted to those instances where its remedial objectives are thought most efficaciously served," and where its application "does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted." *Arizona v. Evans*, 514 U.S. 1, 11 (1995) (quoting, in latter part, *United States v. Janis*, 428 U.S. 433, 454 (1976)).

# ANALYSIS

The Court must consider de novo Defendant's Objection to the R&R and, based upon its review, "may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." Fed. R. Crim. P. 59(b)(3). In his Motion, Defendant seeks to exclude from trial all evidence derived from the Warrant executed upon the Frankfort Residence. Dkt. No. 20. In briefing and oral argument, he maintained that the Warrant failed to satisfy both the probable cause and particularity requirements of the Fourth Amendment. Dkt. No. 29 at 5. Defendant now claims in his Objection that the R&R fails to adequately address both of these contentions. Dkt. No. 30. Particularly, he disputes the Magistrate Judge's conclusions on ripeness of probable cause, particularity of persons to be searched and evidence to be seized, applicability of the severance doctrine, and viability of the good faith exception. *Id.*

Whereas Defendant bears the burden of establishing the Warrant's alleged deficiencies with respect to probable cause and particularity, it is the Government's responsibility to show, if necessary, that its agents' reliance on the Warrant was objectively reasonable. Dkt. No. 29 at 6 (citing *United States v. Esser*, 451 F.3d 1109, 1112 (10th Cir. 2006); *United States v. Cook*, 854 F.2d 371, 373 (10th Cir. 1988)). To determine whether either of these burdens has been met, it is the station of this Court to assess the credibility of witnesses, the weight of evidence, and any reasonable inferences to be drawn therefrom. *Id.* (citing *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004)). Having done so here, the Court finds that Defendant has not met its burden on either front. Based on the totality of evidence and circumstances, there was sufficient probable cause to issue the Warrant, and its limited overbreadth in scope proves nonfatal. Irrespective of these findings, the Court is satisfied with the Government's showing of good faith on the part of its agents, and Defendant's efforts to preclude application of the exception fall short of the mark.

I.      **Probable Cause**

Because a magistrate's determination of probable cause is by all accounts subjective, the decision to issue a warrant is necessarily accorded substantial deference by a reviewing court. *United States v. Leon*, 468 U.S. 897, 914 (1984) ("Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination.") (collecting cases); *United States v. Martinez*, 764 F.2d 744, 746 (10th Cir. 1985). "[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). The applicable standard of review is "a flexible, common-sense standard," wherein "no single factor or factors is dispositive." *United States v. Knox*, 883 F.3d 1262, 1275 (10th Cir. 2018). Where, as here, a contested warrant issues based on an officer's supporting affidavit, so too must the reviewing court's evaluation be constrained within the four corners of the warrant and affidavit. *See id.* at 1272; *United States v. Glover*, 104 F.3d 1570, 1578 (10th Cir. 1997).

A.      **The 911 Call and Investigation**

According to the R&R, "Defendant . . . contends that Vanhoozer did not adequately verify or investigate the anonymous 911 caller's information, and that such call cannot support a finding of probable cause, citing *United States v. Daniels*, 101 F.4th 770 (10th Cir. 2024)." Dkt. No. 29 at 10. This argument was presumably raised at the evidentiary hearing, for it does not appear in either Defendant's Motion or his Objection. *But see* Dkt. No. 30 at 2 (noting in the case summary, and only in passing: "No further investigation was conducted at the scene that day, and the 911 callers were not contacted"). As an initial matter, because Defendant has not clearly raised this argument in his Objection, the Court need not address it further here.

B.    **Ripeness of Probable Cause**

Defendant's remaining arguments on probable cause seek to undermine the Warrant's ripeness based upon its issuance two weeks after Officer Vanhoozer's dispatch to the Frankfort Residence. *See* Dkt. No. 30 at 3-5. By that time, Defendant argues that probable cause had become stale, thus rendering the Warrant lacking in probable cause at the time it was issued. *Id.*

To determine whether there is probable cause to issue a search warrant, a magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 214. A "fair probability" does not equate to "an airtight guarantee; nor is it 'proof that something is more likely true than false.'" *United States v. Jenkins*, 819 F. App'x 651, 658 (10th Cir. 2020) (quoting *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014)). Rather, a magistrate's determination of probable cause is merely weighed against that of the ordinary person of reasonable prudence. *Kaley v. United States*, 571 U.S. 320, 338 (2014) ("Probable cause, we have often told litigants, is not a high bar[.]"). To determine probable cause, the magistrate "may draw reasonable inferences from the material provided in the warrant application." *United States v. Rowland*, 145 F.3d 1194, 1205 (10th Cir. 1998). Moreover, "[a] magistrate is entitled to rely on the expert opinions of officers when supporting factual information is supplied in the affidavit." *United States v. Cook*, 949 F.2d 289, 292-93 (10th Cir. 1991). In short, "the Fourth Amendment's requirement of probable cause for the issuance of a warrant is to be applied not according to a fixed and rigid formula, but rather in the light of the 'totality of the circumstances' made known to the magistrate." *Upton*, 466 U.S. at 728.

Regarding a warrant's timeliness, "[t]he Fourth Amendment requires probable cause to persist from the issuance of a search warrant to its execution." *United States v. Garcia*, 707 F.3d 1190, 1195-96 (10th Cir. 2013). Equally, a warrant may not issue based upon "stale information

that no longer suggests that the items sought will be found in the place to be searched." *United States v. Snow*, 919 F.2d 1458, 1459-60 (10th Cir. 1990) (citing *United States v. Shomo*, 786 F.2d 981, 983 (10th Cir. 1986)).  As with findings of probable cause in general, evaluation of a warrant's timeliness is made in light of the totality of the circumstances, including the type of crime under investigation, the duration of the alleged criminal activity, and the nature of evidence to be seized. *Knox*, 883 F.2d at 1276-77 (citing *Snow*, 919 F.2d at 1460).  For instance, probable cause is less likely to be foreclosed even "on the basis of otherwise dated information" where the crime under investigation is of a "continuous and ongoing" nature. *Id.* (citing *United States v. Mathis*, 357 F.3d 1200, 1207 (10th Cir. 2004)).  "In the typical case where the police seek permission to search a house for an item they believe is already located there, the magistrate's determination that there is probable cause for the search amounts to a prediction that the item will still be there when the warrant is executed." *United States v. Grubbs*, 547 U.S. 90, 95 (2006).

As acknowledged in the Magistrate Judge's R&R, the Warrant here was not issued pursuant to illegal activity of a continuous and ongoing nature but, instead, on the fleeting discharge of a firearm. Dkt. No. 29 at 9.  Even so, the Affidavit offers sufficient information by which to find that probable cause remained ripe even two weeks after the reported shooting. Properly relying on the factual account made therein as well as the expert opinions offered by Officer Staggs, it would have been fully reasonable for the issuing magistrate to anticipate that evidence of the shooting would likely remain at the Frankfort Residence upon execution of the Warrant.  The 911 caller relayed from a neighbor that the gunshots had originated from within the Frankfort Residence; Officer Vanhoozer saw a man carrying what appeared to be a firearm into the residence shortly after he arrived at the scene; Mr. McGuire confirmed that the man lived with him in the building; and an individual matching the man's physical description—Mr. Ford—later

exited the building.  Dkt. No. 20-1 at 2.  Although Mr. Ford wore a different hoodie and was not confirmed to be the same individual seen entering the building with a potential firearm [*id.*], the inference is reasonable.  Because the Affidavit does not indicate that Mr. Ford appeared to have a gun with him upon exiting the building, one might also reasonably infer that Mr. Ford might have left such a firearm inside the premises.  Finally, based on Officer Stagg's training and experience, "those who possess firearms often store them at their place of residence for safe keeping."  *Id.* "[D]ue to a firearm's high street value and difficulty to obtain after a felony conviction, convicted felons usually retain these firearms and rarely dispose of them even after a high-profile incident." *Id.*  For those same reasons, "firearms are a constant target of thieves, are in great demand, and can easily be sold on the street" [*id.*], hence the habit of most every gun owner—felon or otherwise—of keeping firearms stored inside their homes or, albeit less advisably, in their vehicles. As for the caliber of individual one might suspect to have indiscriminately fired off seven rounds of ammunition into a neighborhood and with such wanton recklessness as to nearly miss a man's head twice, it hardly eludes imagination to conceive of said person as potentially being a convicted felon and therefore, based on Officer Staggs's expert opinion, more likely than not to hold onto a firearm even after using it to commit such a brazen act.

Defendant argues that, contrary to the R&R's analysis, "[c]rediting the Affidavit's claim that firearms are constantly stolen and easily sold clearly shows firearms often and easily change hands," thus "support[ing] a finding of staleness."  Dkt. No. 30 at 4.  Furthermore, he argues that the Affidavit's statement that "convicted felons usually retain . . . firearms and rarely dispose of them even after a high profile incident . . . implies that retention of firearms after a 'high profile incident' is a distinct characteristic of convicted felons and the commonsense reading is that this characteristic is not likely among non-felons."  *Id.*  "Because there was no basis in the Affidavit to

believe that any resident of the home was a convicted felon," he maintains that the Affidavit itself "suggests that the firearm involved in this incident . . . was likely not to be retained, therefore further supporting a finding of staleness." *Id.*  Finally, "[n]othing in the Affidavit indicated that spent bullets or shell casings are likely to remain in place for two weeks, and there is no basis in the Affidavit to believe that spent bullets or shell casings could be linked to a discharge of an unidentified firearm two weeks past." *Id.*

Defendant omits from his analysis another, rather clarifying insight from Officer Staggs: "Your Affiant knows that firearms are valuable and are usually held by criminals for long periods of time." Dkt. No. 20-1 at 3.  It was not necessary for any of the Frankfort Residence inhabitants to have been felons in order for the issuing magistrate to have reasonably suspected that one or more firearms would remain on the premises.  "Every person who willfully discharges any pistol, rifle, shotgun, airgun[,] or other weapon . . . in any public place, or in any place where there is any person to be endangered thereby, although no injury to any person shall ensue, is guilty of a misdemeanor."  21 O.S. § 1364.  Whoever was responsible for the reported shooting was, by definition, a criminal from the moment they discharged a firearm in a residential neighborhood. Hence, it would have been entirely reasonable for the magistrate to have relied on this statement by Officer Staggs and to conclude that, regardless of whether any felon was involved, whoever was responsible for the reported shooting was regardless a criminal and therefore likely to hold onto their firearms for long periods of time.

Despite Defendant's efforts to illuminate "the commonsense reading" of the Affidavit, he has instead offered an interpretation that is now at odds with those of the issuing magistrate, Magistrate Judge Jayne, and this Court.  Putting aside the syllogisms evident in his own interpretation's logic, it is entirely beyond Defendant's purview to conclusively establish which

among the inferences to be made from the Affidavit is the most reasonable and ought to control. Because the Court finds that there was substantial evidence afforded to the issuing magistrate by which to reasonably deduce probable cause at the time the Warrant was issued, it matters not whether there were any better inferences to be made.[1] *See Upton*, 466 U.S. at 728. Defendant's argument regarding bullet casings is less availing. Certainly, Officer Staggs did not offer any statements to the effect of bullet casings being likely to remain at the scene of a shooting, but it does not take an expert to know that where there is smoke, there is likely to have been a fire.

## II.    Particularity

The Fourth Amendment's particularity requirement is aimed chiefly the prevention of wide-ranging, exploratory searches permitted under general warrants. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). To that end, the Constitution requires that a warrant set forth in particular terms just two matters: "the place to be searched" and "the persons or things to be seized." *Grubbs*, 547 U.S. at 97; *accord United States v. Cotto*, 995 F.3d 786, 798 (10th Cir. 2021). In latter part, "a search warrant 'must describe the items to be seized with as much specificity as the government's knowledge and circumstances allow.'" *United States v. Suggs*, 998 F.3d 1125, 1132 (10th Cir. 2021) (quoting *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988)). A warrant's failure to do so is generally fatal, as "[w]arrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." *Leary*, 846 F.2d at 600 (quoting *United States v. Fuccillo*, 808 F.2d 173, 176 (1st Cir. 1987)).

---

[1] Ultimately, of course, there were no better inferences to be made. The Fourth Amendment is doubtless concerned with the proper means of search and seizure, and a finding of probable cannot in any way be upheld ex post facto based upon to the actual yield of a search. Yet, there remains something to be said of the fact that the outcome of the search in this case lends no support whatsoever for Defendant's reading of the Affidavit. All the evidence he argues was unlikely to have been found at the Frankfort Residence was, in fact, recovered.

Defendant's argument for suppression is further premised on his characterization of the Warrant as a general warrant and its supposed provision of overbroad categories of persons and items to be seized.  Dkt. No. 20 at 4-6.  He objects to the R&R's analysis on each of these terms and to the Magistrate Judge's application of the severability doctrine adopted by the Tenth Circuit in *United States v. Brown*, 984 F.2d 1074 (10th Cir. 1993).  Dkt. No. 30 at 5-9.  Each of his arguments is addressed, in turn, below.

A.    **Although the Warrant neither incorporates the Affidavit by reference nor identifies a crime under investigation, it cannot be branded a general warrant given the particularity of its terms.**

Defendant asserts that the Warrant in this case constitutes a general warrant because it failed to incorporate the respective Affidavit by reference, thus leaving the Warrant facially bereft of any indication of "what crime was being investigated, what type of firearm was implicated, and who was a suspect."  Dkt. No. 20 at 5.  Absent such reference, he argues that "officers were left to discern these matters themselves and free to rummage through the belongings and person of everyone found at [the Frankfort Residence]."  *Id.*; *see also* Dkt. No. 30 at 10 ("As written, the Warrant here permits police to enter the home of unidentified residents, search the person and related vehicles of any person found on the premises, and seize broad categories of generally legally possessed items without any indication what crime is being investigated.").

In *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) the United States Supreme Court held that a warrant "was plainly invalid" where it failed to list any particularized set of items to be seized. The warrant in question was submitted to a magistrate as a signable form alongside two supporting documents prepared by the same officer, namely, a warrant application and affidavit.  *Id.* at 554. "[T]he application particularly described the place to be searched and the contraband [the officer] expected to find," and the affidavit in turn "set forth the basis for [the officer's] belief that the listed items were concealed on the [premises to be searched]."  *Id.*  "[T]he warrant itself was less

14

specific; it failed to identify any of the items that [the officer] intended to seize." *Id.* "[N]or did either the affidavit or the application (which had been placed under seal) accompany the warrant" upon being served. *Id.* at 558. Despite a recitation in the warrant "that the Magistrate was satisfied the affidavit established probable cause to believe that contraband was concealed on the premises," the Supreme Court found that the warrant had nevertheless failed to incorporate by reference either of the supporting documents submitted to the magistrate. *Id.* at 554, 558. Because the warrant did not itself list any particular items to be seized and did not refer to the affidavit bearing such a list, the Court held that the warrant's "facial invalidity" could not be saved. *Id.* at 557. In passing upon the incorporation of supporting documents generally, the Court noted that "most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Id.* at 557-58 (collecting cases, including *United States v. Williamson*, 1 F.3d 1134, 1136, n.1 (10th Cir. 1993)). However, because neither of those things had been done, the Court abstained from further comment on the matter. *Id.* at 558.

The rule alluded to in the *Groh* Court's majority opinion is more fully stated in the Tenth Circuit decision referenced therein:

> [T]he contents of the warrant application or its accompanying affidavit . . . can cure a defective warrant only when *both* of two requirements are met: "first, the affidavit and search warrant must be physically connected so that they constitute one document; and second, the search warrant must expressly refer to the affidavit and incorporate it by reference using suitable words of reference." *Leary*, 846 F.2d at 603 (quoting 2 Wayne R. LaFave, Search and Seizure § 4.6(a), at 241 (2d ed. 1987)).

*Williamson*, 1 F.3d at 1136 n.1. *See also id.* at 1135-36 (holding that a warrant was "manifestly defective" where it failed to describe the place to be searched with sufficient particularity such that executing officers could locate and identify it with reasonable effort); *United States v. Dahlman*, 13 F.3d 1391, 1395 (10th Cir. 1993) (same). The Tenth Circuit recently revisited application of

15

this rule in *United States v. Suggs*, 998 F.3d 1125 (10th Cir. 2021).  There, the warrant "targeted some particular items but also included a catch-all phrase authorizing the search and seizure of any item identified as being involved in a crime."  *Id.* at 1132-33 (cleaned up).  "Nowhere," however, "[did] the warrant reference any specific offense—let alone the particular firearm-related crime under investigation."  *Id.* at 1134.  These two factors together rendered the warrant "[s]o open-ended" as for the Circuit Court to conclude that it "[could] only be described as a general one, akin to the instruments of oppression vivid in the memory of newly independent Americans when the Fourth Amendment was adopted."  *Id.* at 1135.  The Circuit rejected the government's assertions that the warrant's facial deficiency could be cured by either implying that the warrant had incorporated a supporting affidavit by reference notwithstanding its omission of suitable words of reference or, alternatively, by considering that the officer responsible for preparing the affidavit was among those who executed the search.  *Id.* at 1336.  In doing so, the Circuit explained that the Fourth Amendment demands that "the description of what is sought to be seized [be] written in, or incorporated into, the warrant to ensure that the executing officer(s) stay within the specific bounds set by the issuer."  *Id.* at 1136 (citing *Leary*, 846 F.2d at 600).  Thus, to concede either of the government's assertions would have been to arbitrarily "elevate the author of the unincorporated affidavit over the warrant's issuer, thereby transforming the independent magistrate into little more than a rubber stamp."  *Id.* at 1137.

The Tenth Circuit's earlier decision in *Cassady v. Goering*, 567 F.3d 628 (10th Cir. 2009) sheds further insight into the proper application of the Fourth Amendment's particularity requirement insofar as general warrants are concerned.  The warrant in contest there was issued upon probable cause to search for evidence related to marijuana cultivation.  *Id.* at 635.  In addition to authorizing a search of the farm where marijuana was reportedly being grown, the warrant

enabled officers to search inside defendant's home without any indicia of probable cause that evidence related to the marijuana cultivation was likely to be found therein. *Id.* As for the property to be seized, the warrant provided for "any and all narcotics, any and all illegal contraband, and various specific items mostly related to a narcotics operation." *Id.* (cleaned up).

> In addition, however, and most damaging to [Sheriff] Goering's argument, the warrant expressly permitted the search and seizure of "all other evidence of criminal activity" as well as personal property that was stolen, embezzled, or otherwise illegal; or was designed, intended, or had been used to commit a criminal offense; or would be material evidence in a criminal prosecution in Colorado or any other state; or the seizure of which was expressly required, authorized, or permitted by any Colorado statute. Hence, the warrant did not confine the scope of the search to any particular crime. The officers only had probable cause to search for evidence related to marijuana cultivation, yet the warrant authorized the seizure of *all* possible evidence of *any* crime in *any* jurisdiction.

*Id.* (citations omitted). "Consequently, '[t]he warrant[] allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the fourth amendment proscribes.'" *Id.* (quoting *Voss v. Bergsgaard*, 774 F.2d 402, 405 (10th Cir. 1985) (alterations original)).

The assertion Defendant makes in his Motion, that the Affidavit here cannot be read into the Warrant such as to bolster the particularity of its terms, is meritorious. There is no indication that the Warrant was presented with the Affidavit physically attached to it, nor is the Affidavit expressly incorporated by reference in the Warrant. The R&R concedes this much. Dkt. No. 29 at 14. Where Defendant misses the mark is by later attempting to resuscitate the argument in his Objection by narrowing in on the Warrant's omission of reference to a crime under investigation. *See* Dkt. No. 30 at 10. True, the R&R identifies this omission as "[t]he most problematic aspect of this Warrant," but the Magistrate Judge's ensuing analysis is nevertheless spot on: "the Warrant remedied that omission by listing *only* specific items to be seized and not including any type of 'catch all' provision or 'indicia' language at the end of the list." Dkt. No. 29 at 15. Unlike the

warrant in *Groh*, the Warrant here does enumerate a list of items to be seized from the Frankfort Residence, and unlike the warrants in *Suggs* and *Cassady*, the Warrant here lacks any of the catch-all provisions that the Tenth Circuit has deemed to be characteristic of general warrants.

"To be invalidated as general, the warrant must 'vest the executing officers with unbridled discretion to conduct an exploratory rummaging through [the defendant's property] in search of criminal evidence.'" *United States v. Cotto*, 995 F.3d 786, 798 (10th Cir. 2021) (quoting *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d 137, 149 (3d Cir. 2002)). That is simply not the case here. The Warrant's scope is circumscribed to the seizure of discrete categories of items typically used as evidence of a shooting, and it confines the search within the limited bounds of a residential address wherein a shooting was reported to have taken place. It is therefore of little consequence that the Warrant did not also advise executing officers of the shooting itself. *See United States v. Christie*, 717 F.3d 1156, 1165 (10th Cir. 2013) ("[W]e have said warrants may pass the particularity test if they limit their scope either 'to evidence of specific federal crimes *or* specific types of material." (emphasis added) (quoting *United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005) and collecting cases); *United States v. Reyes*, 798 F.2d 380, 382 (10th Cir. 1986) (holding that there was probable cause to search the defendant's residence despite the affidavit's omission of any reference to the conducting of unlawful activities at the residence). *Cf. Suggs*, 998 F.3d at 1133 ("When a warrant does not otherwise describe the evidence to be searched for and seized with sufficient particularity, that gap can sometimes be filled if the warrant specifies the crime under investigation.").

### B.    The Warrant's scope was not impermissibly overbroad.

The Warrant delineates eight categories of items to be seized from the Frankfort Residence: (1) firearms; (2) ammunition; (3) magazines, holsters, and other items associated with firearms; (4) spent cartridge casings; (5) gun boxes, gun cases, safes, and lock boxes; (6) proof of ownership

of such items; (7) proof of residency; and (8) cell phones and contents within. Dkt. No. 20-2 at 1.

The Warrant next describes the Frankfort Residence and gives the following operative language:

> **YOU ARE THEREFORE COMMANDED** at any time of the **day** to make search of said person, vehicles (directly on the property or in the street in the front of, or nearby, or adjacent to the above identified location, provided that prior to searching said vehicle or vehicles, the vehicles can be specifically connected to a suspect at the location) and/or house, building and premises, the curtilage thereof and the appurtenances thereunto belonging for the described property, and if found to seize the same and safely keep it, and bring it before me [the magistrate] at the Tulsa County Courthouse in accordance with the subsequent order of the court, and make return hereof within **Ten** days.

*Id.* Defendant takes issue with practically all of the above. Many of the claims made in his Motion are essentially conclusory—including those contesting the Warrant's provisions for seizure of proof of ownership, proof of residency, and cell phones—and not reiterated in his Objection. *Compare* Dkt. No. 20 at 5-6, *with* Dkt. No. 30 at 5-7. As such, the Court need only address Defendant's two remaining arguments pertaining to the Warrant's scope, those regarding the seizure of "firearms" and of all persons within the Frankfort Residence.

To reiterate, the Fourth Amendment's particularity requirement was designed with general warrants foremost in mind, interdicting any "general, exploratory rummaging in a person's belongings" by government officials. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). This has long been the case. *See Marron v. United States*, 275 U.S. 192, 196 (1927) ("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."). More recently, the proscription against general warrants has been extended to warrants deemed "overly broad." *See, e.g.*, *Cotto*, 995 F.3d at 798. "[A]n overly broad warrant 'describes in both specific and inclusive generic terms what is to be seized, but it authorizes the seizure of items as to which there is no probable cause.'" *Id.* (quoting *Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d at 149). That is, probable cause must be shown for each and every person and thing that a warrant enables officers to search and seize.

In evaluating a warrant's scope for overbreadth, "[t]he test applied to the description of the items to be seized is a practical one." *Leary*, 846 F.2d at 600. "Even a warrant that describes the items to be seized in broad or generic terms may be valid 'when the description is as specific as the circumstances and the nature of the activity under investigation permit.'" *Id.* (quoting *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985)). Defendant contends that the circumstances here did not justify the Warrant's broad provision for search and seizure of all firearms of any kind discovered at the Frankfort Residence, nor of all persons located therein at the time of the search. The Court disagrees.

> ### i.    "Firearms"

Defendant notes that, per the Affidavit, "the crime being investigated was the discharge of a firearm and a single person was witnessed carrying a pistol." Dkt. No. 20 at 5. "Without more, he argues, "there was no probable cause to search and seize *all types of* firearms where there was only reason to believe that a pistol or handgun was used in the offense." *Id.*; *see also* Dkt. No. 30 at 5-6 (asserting that the R&R's conclusion that multiple weapons may have been involved in the reported shooting "is purely speculative and contrary to the language of the Affidavit," which "only speaks of '*the* gun,' '*a* handgun,' and '*the* firearm[,]' signaling that police did not believe that multiple firearms were involved").

To begin, the premise of Defendant's argument is not entirely accurate. The Affidavit does not conclusively assert that Officer Vanhoozer witnessed a person carrying a pistol; rather, it states that "he observed a tall skinny black male enter 2021 North Frankfort Place holding *what he believed to be* a black semi-automatic handgun." Dkt. No. 20-1 at 2 (emphasis added). *But see id.* (indicating further down that, upon review of the body camera footage, Officer Staggs observed "a young black male that matches the physical description of who Ofc. Vanhoozer saw enter the

house with a handgun exit[] the residence" and, after speaking to Mr. Ford, "Ofc. Vanhoozer stated that the individual he observed with a black semi-automatic handgun looked just like Ford"). In reality, there is nothing in the Affidavit to foreclose the possibility that the man had been carrying a different type of firearm or even no firearm at all, and it would make no difference either way.

The unpublished opinion Defendant cites in support of his argument was based upon facts distinguishable from those in the instant case. *See* Dkt. No. 30 at 6 (citing *United States v. Jimenez*, 205 F. App'x 656 (10th Cir. 2006)). Akin to the Warrant here, the warrant in *Jimenez* authorized a search for "any firearms." 205 F. App'x at 662. The warrant's recitation of probable cause referred to information supplied by affidavit recounting three eyewitness reports of an unidentified suspect shooting a man in the back of the neck while the two were together in a car. *Id.* at 658. Although the affidavit stated that none of the eyewitnesses could identify the shooter or the type of gun he used, the officer who authored it later testified at a suppression hearing that at least one witness had indicated that the shooter used a handgun. *Id.* at 661-62. The Tenth Circuit concluded that, "[t]hough there was probable cause to search for a handgun," the warrant was "overbroad" insofar as it authorized a search for "any firearms." *Id.* at 662.[2]

Unlike in *Jimenez*, there were no eyewitnesses to the shooting in this case, and there is no indication that the Affidavit contained any misleading information supplied by Officer Staggs. The 911 caller here did not report actually seeing any of the shots being fired, nor was there any information provided from the neighbor as to who was responsible for the shooting, let alone what kind or how many firearms may have been used. Officer Vanhoozer merely reported observing

---

[2] Notwithstanding its determination that the warrant was overbroad for authorizing seizure of "any firearms," the Tenth Circuit went on to "conclude that the good-faith exception applied to the officers' reliance on the warrant." *Id.* Hence, even in the authority Defendant cites, the decision to admit the evidence in contest was ultimately affirmed.

what appeared to have been a black semi-automatic handgun being carried into the Frankfort Residence, but this was *after* the shooting had already occurred.  Even if the Affidavit confirmed that the object Officer Vanhoozer saw was in fact a handgun, the Affidavit would still be devoid of information upon which to conclude that said handgun was the only firearm that could have possibly been used in the shooting.  *Contra* Dkt. No. 20 at 5 (Defendant claims, "there was only reason to believe that a pistol or handgun was used in the offense").  Thus, unlike in *Jimenez*, the information supplied in the Affidavit by all accounts indicates that "firearms" was as specific a term as the circumstances and the nature of the activity under investigation permitted.

The United States Supreme Court addressed arguments similar to those made by Defendant in *Messerschmidt v. Millender*, 565 U.S. 535 (2012).  There, a woman was attacked by her boyfriend in retaliation for her calling to have police present while she moved out of her apartment. *Id.* at 539-40.  The assault concluded with the boyfriend running out in front of the woman's car, pointing a sawed-off shotgun at her, and threatening to kill her if she tried to leave.  *Id.* at 540.  As the woman fled, the boyfriend shot at her car five times, blowing out her car's left front tire in the process.  *Id.*  The woman managed to escape and soon after described the assault in detail to law enforcement.  *Id.*  The officer assigned to investigate the case later discovered that the boyfriend was a gang member and felon convicted of numerous violent and firearm-related offenses.  *Id.* While the shooting under investigation was known to have involved only one firearm, and of a known type at that, the warrant to search his residence called for the seizure of, inter alia, "[a]ll handguns, rifles, or shotguns of any caliber, or any firearms capable of firing ammunition, or firearms or devices modified or designed to . . . fire ammunition."  *Id.* at 541.  A supporting affidavit expressly incorporated by reference in the search warrant, "described the facts of the incident . . . in great detail, including the weapon used in the assault."  *Id.* at 542.  Based upon the

foregoing, the Court held that "it would not have been 'entirely unreasonable' for an officer to believe, in the particular circumstances of this case, that there was probable cause to search for all firearms and firearm-related materials." *Id.* at 549 (quoting *Gates*, 462 U.S. at 238).

*Messerschmidt* is no doubt distinguishable from the instant case insofar as that the shooting here was not initially known to have involved a felon.  Still, the Court's analysis proves instructive:

> Even if the scope of the warrant were overbroad in authorizing a search for all guns when there was information only about a specific one, that specific one was a sawed-off shotgun with a pistol grip, owned by a known gang member, who had just fired the weapon five times in public in an attempt to murder another person, on the asserted ground that she had "call[ed] the cops" on him. . . .  Evidence of one crime is not always evidence of several, but given [the boyfriend's] possession of one illegal gun, his gang membership, his willingness to use the gun to kill someone, and his concern about the police, a reasonable officer could conclude that there would be additional illegal guns among others that [the boyfriend] owned.

*Id.* at 548-49 (Roberts, C.J.) (footnote omitted).  The Affidavit in this case bears a similar set of indicia to suggest to a reasonable officer that there may have been multiple firearms found at the Frankfort Residence and, if so, all would merit seizure.  Further reflecting upon the facts in *Messerschmidt*, the Supreme Court remarked that "[a] reasonable officer also could believe that seizure of [all] firearms was necessary to prevent further assaults on [the girlfriend]." *Id.* at 549. Equally here, Officer Staggs could have reasonably believed that seizure of any and all firearms from the Frankfort Residence was necessary to protect the public from the threat of additional shootings perpetrated by its inhabitants.  Such a threat would have been reasonable to anticipate based upon the facts in the Affidavit, which hardly manifest anything other than wanton disregard for both the safety of others and the law designed to protect it.  Had multiple firearms been found, the seizure of just one or of only one type probably could not have sufficed to neutralize the threat.

The R&R also highlights an important practical consideration in evaluating the Warrant's scope of items to be seized:  "All types of firearm-related items constitute evidence of who ultimately committed the crime of unlawfully discharging a firearm on April 1, 2025, either with

his own firearm or a firearm belonging to someone else in the residence." Dkt. No. 29 at 19.  The same holds true for firearms themselves.  If multiple firearms had been found at the Frankfort Residence, officers executing the search would have been unable to confirm on-scene which among them had been used in the shooting.  Imagine if, in addition to the 9mm handgun and spent 9mm shell casings ultimately found at the Frankfort Residence, officers also discovered a 9mm rifle in the building.  In that case, there would have been no readily apparent means of identifying which of the two, if not both, was the true smoking gun.  Had the Warrant been limited to the seizure of just one kind of firearm—e.g., "handguns"—officers would have additionally been without recourse to seize both for further examination.[3]

### ii.    Persons Subject to Search and Seizure

Defendant further objects to the Magistrate Judge's analysis regarding the Warrant's scope of persons subject to search and seizure.  Dkt. No. 30 at 6-7.  In his view, "[t]he Affidavit *clearly* states that a handgun was seen in the possession of a single individual described as a 'tall black skinny male' and that the police *knew* at least one resident of the home, Mr. McGuire, was a witness to and not a participant in the alleged discharge of a firearm that day."  *Id.* (emphasis added).  "The [R&R]," he claims, "dismisses this failure to particularize the Warrant in part on the basis that the Warrant was primarily for a residence."  *Id.* at 7.  According to Defendant, "this ignores the plain language of the Warrant[,] which authorizes officers to search and seize every person found at the home – even Mr. McGuire – without probable cause to believe anyone other

---

[3]  It is relatively common knowledge that a majority of gun owners in this country own more than one firearm.  *See* Kim Parker et al., *America's Complex Relationship With Guns*, Pew Research Center, 22 (June 2017), https://www.pewresearch.org/wp-content/uploads/sites/20/2017/06/Guns-Report-FOR-WEBSITE-PDF-6-21.pdf (reporting polling data indicating 68% of gun owners own multiple guns).  Even without the expert opinions provided by Officer Staggs, the issuing magistrate here could have just as easily deduced the possibility of multiple firearms being found in the Frankfort Residence based solely upon Officer Vanhoozer's belief of seeing just one.

than the 'tall skinny black man' was involved." *Id.*

Defendant again bases his argument on incorrect suppositions. The Affidavit does not "clearly state[]" that what Officer Vanhoozer observed was conclusively a handgun, and the Court need not belabor that point. Defendant's conjecture regarding Mr. McGuire is even more so out of step with the Affidavit, which by no means suggests that "the police knew . . . Mr. McGuire[] was a witness to and not a participant in" the reported shooting. To the contrary, the Affidavit relates that Mr. McGuire offered a shifting account of the reported shooting. Dkt. No. 20-1 at 2. He also "implies that the individual*(s)* shooting the gun were not shooting at dogs, or people, or houses and *they* were just 'harmless.'" *Id.* (emphasis added). In turn, Mr. Jones supplied a conflicting story about shooting fireworks, and the Affidavit notes that Officer Vanhoozer could not confirm whether Mr. Jones was the exact same man he had observed entering the residence earlier. *Id.* On the whole, the Affidavit offers no information whatsoever by which to conclusively narrow the suspects involved in the shooting to anyone other than the individuals found residing at the Frankfort Residence. The R&R's analysis does not "ignore the plain language of the Warrant," it accurately identifies an almost inevitable conclusion: "The primary purpose of this Warrant was search of the residence, which was particularly described." Dkt. No. 29 at 16 n.4. The Court is entirely satisfied with the R&R's analysis in that respect. The Warrant's provision for search and seizure of any person located at the Frankfort Residence was as particular as the circumstances and the nature of the activity under investigation permitted.

### iii.    The Warrant's limited overbreadth is severable.

The Magistrate Judge does find that the Warrant was overbroad in its provision for the search and seizure of "cell phones and contents within." Dkt. No. 29 at 21. However, as the R&R correctly indicates, executing officers did not ultimately seize any cell phones from the Frankfort

Residence. *Id.* at 22; *see generally* Dkt. No. 21-1 at 6-8 (Officer's Return). Moreover, because "[t]he invalid seizure of 'cell phones and contents within' is clearly a delineated section" within the Warrant and "does not make reference to the other, valid sections," the Magistrate Judge ultimately concludes that the Warrant's limited overbreadth is severable and therefore not fatal to the Warrant's validity. Dkt. No. 29 at 22-23.

Defendant objects to the R&R's application of the severance doctrine only insofar as it fails to likewise recognize as overbroad the Warrant's provisions for the seizure of "firearms" and search of all persons located at the Frankfort Residence. Dkt. No. 30 at 7-9. As explained above, the Court does not find either of those provisions to have been overbroad. Because the Court also concurs with the Magistrate Judge's application of the severance doctrine in general, it need not set out its own application here. Instead, those portions of the R&R's analysis are hereby adopted and incorporated by reference in this Opinion.

## III.    The Good Faith Exception

As a final matter, even had the Court reached contrary findings on either probable cause or particularity, the evidence Defendant seeks to suppress would nevertheless almost certainly qualify for admission under the good faith exception. The Government has met its burden of establishing the good faith presumption, and Defendant's arguments in rebuttal are unavailing.

Even where a warrant is later deemed invalid by a reviewing court, the exclusionary rule is not triggered unless there is a showing of "deliberate, reckless, or grossly negligent" conduct by the Government's agents. *Herring v. United States*, 555 U.S. 135, 145 (2009). The conduct "must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* (holding that there was not a requisite showing to warrant exclusion where police conducted a search based upon the reasonable

yet mistaken belief that an outstanding warrant existed, where said warrant had in fact been recalled but remained in the officers' records due to negligent bookkeeping of another employee). Conversely, "[w]hen police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." *Id.* at 142 (quoting *Leon*, 468 U.S. at 922); *accord United States v. Edwards*, 813 F.3d 953, 970 (10th Cir. 2015); *see also United States v. Little*, 119 F.4th 750, 767 (10th Cir. 2024) ("Since *Leon*, the Supreme Court has extended its holding and applied the good faith exception in a variety of cases where officers acted objectively reasonably under the circumstances, even in the absence of a search warrant.") (collecting cases).

The Government bears the burden of establishing that its agents' reliance on the Warrant was reasonable. *United States v. Cook*, 854 F.2d 371, 373 (10th Cir. 1988). Yet, "officers are generally not required to second-guess the magistrate's decision in granting a warrant." *United States v. Gonzales*, 399 F.3d 1225, 1228-29 (10th Cir. 2005) (citing *United States v. Tuter*, 240 F.3d 1292, 1300 (10th Cir. 2001)). An executing officer's reliance upon a search warrant issued by a neutral magistrate judge thus "creates a presumption that the officer is acting in good faith." *United States v. Chambers*, 882 F.3d 1305, 1310 (10th Cir. 2018). Once established, the presumption sets a high bar for rebuttal. *Messerschmidt*, 565 U.S. at 547 ("Our precedents make clear . . . that the threshold . . . is a high one, and it should be."). A movant may establish lack of good faith under just four circumstances:

(1) when the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his reckless disregard of the truth; (2) when the issuing magistrate wholly abandons her judicial role; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; [or] (4) when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

*United States v. Augustine*, 742 F.3d 1258, 1262 (10th Cir. 2014) (cleaned up) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1007 (10th Cir. 2000) (in turn citing *Leon*, 468 U.S. at 923)).

The Court is satisfied with the Government's showing of good faith on the part of its agents. "[I]t is indicative of good faith when," as here, "the officer who prepares an affidavit is the same one who executes a search." *Cotto*, 995 F.3d at 796. Likewise, "good faith may exist when a minimal nexus between the place to be searched and the suspected criminal activity is established." *Gonzales*, 399 F.3d at 1231. "The minimal nexus requirement does not require that 'hard evidence or "personal knowledge of illegal activity" link a defendant's suspected unlawful activity to his home'" but may instead be found simply where "an affidavit . . . describes circumstances which would warrant a person of reasonable caution in the belief that the articles sought are at a particular place." *United States v. Campbell*, 603 F.3d 1218, 1231 (10th Cir. 2010) (quoting *United States v. Biglow*, 562 F.3d 1272, 1279 (10th Cir. 2009)). In this case, Officer Staggs both authored the Affidavit and served the Warrant, and the information supplied in his Affidavit establishes a robust nexus between the reported discharge of a firearm and the Frankfort Residence. Because no showing has been made of "deliberate, reckless, or grossly negligent" conduct on the part of executing officers, nothing more is required to presume application of the good faith exception.

As for Defendant's effort to rebut the presumption, it is not entirely clear whether he seeks to avoid application of the good faith exception under either the third or the fourth basis identified in *Augustine*. *See* Dkt. No. 30 at 9-10. In either case, the Court is unpersuaded by his arguments.[4]

---

[4] Defendant's appeal to *United States v. Santiago*, 135 F.4th 1235 (10th Cir. Apr. 30, 2025) is misplaced. For one, the Tenth Circuit issued that decision two weeks after the Warrant was executed in this case, meaning that the executing officers here could not have possibly relied upon its authority in assessing the Warrant's validity. *See Davis v. United States*, 564 U.S. 229, 241 (2011) ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule."). Even if Defendant's reliance on *Santiago* were proper, the holding there is based on facts entirely distinguishable from those in the instant case. There,

Consistent with its findings above, the Affidavit bears sufficient indicia of probable cause to render official belief in its existence reasonable, and the Warrant was issued on terms adequately particularized as to reasonably appear valid to executing officers.

### CONCLUSION

Upon consideration of the Magistrate Judge's R&R, de novo review of the issues raised in Defendant's Objection, and for the reasons set forth herein, the Court finds that Defendant's Motion to Suppress should be denied.

IT IS THEREFORE ORDERED that Defendant's Objection to Magistrate's Report and Recommendation [Dkt. No. 30] is OVERRULED. The Court accepts the Magistrate Judge's Report and Recommendation [Dkt. No. 29], and Defendant's Motion to Suppress [Dkt. No. 20] is hereby DENIED.

Dated this 22nd day of October 2025.

_____
JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE

---

the search warrant allowed police to search virtually every location within the defendant's cell phone for evidence of child pornography. *Santiago*, 135 F.4th at 1238. The warrant was issued weeks after the defendant was arrested, and his cell phone was already in the possession of law enforcement. *Id.* There were no provisions in the warrant unrelated to the cell phone, and police did in fact search through the defendant's phone. *Id.* More importantly, the Government already conceded that the warrant was facially overbroad. *Id.* at 1239. Upon finding that the warrant constituted "a classic example of the kind of general search the Fourth Amendment is intended to protect," the Tenth Circuit concluded that "no objectively reasonable officer could rely on it." *Id.* The fact that the warrant's operative language had been copied from an affidavit written by the same officer charged with its execution was of no benefit to the Government. "The execution of a plainly unconstitutional warrant is included in the kind of police misconduct the exclusionary rule seeks to deter." *Id.* at 1240. This Order already addresses at length the distinguishing features of the Warrant here, and there is no reason to rehash any of them in closing.